# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
Filed: February 17, 2022

```
* * * * * * * * * * * * * *
SHARON KABELITZ,              *      No. 17-466V
                             *
            Petitioner,       *      Special Master Sanders
                             *
v.                           *
                             *
SECRETARY OF HEALTH          *      Fact Finding; Onset of Injury;
AND HUMAN SERVICES,          *      Vaccination Site; Influenza ("Flu")
                             *      Vaccine; Shoulder Injury Related
                             *      to Vaccine Administration ("SIRVA")
            Respondent.       *
* * * * * * * * * * * * * *
```

*Leah V. Durant*, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.
*Adriana R. Teitel,* U.S. Department of Justice, Washington, DC, for Respondent.

## FACT RULING[1]

On March 31, 2017, Sharon Kabelitz ("Petitioner") filed a petition pursuant to the National Vaccine Injury Compensation Program.[2] Petitioner alleged that she suffered from a Shoulder Injury Related to Vaccine Administration ("SIRVA") as a result of an influenza ("flu") vaccine administered on November 5, 2015. Pet. at 1, ECF No. 1. Respondent filed his Rule 4(c) report on March 26, 2018, and argued that "this case is not appropriate for compensation under the terms of the Act." Resp't's Report at 2, ECF No. 31. After the parties agreed that a fact ruling was necessary, Petitioner filed a brief "relating to the site of [P]etitioner's vaccine administration and the time of onset of [P]etitioner's SIRVA." Scheduling Order, ECF No. 60; Pet'r's Br. at 1, ECF No. 61. For the reasons discussed herein, I find that Petitioner has provided preponderant evidence that her November 5, 2015 flu vaccine was administered in her right shoulder. However, I find that Petitioner has not provided preponderant evidence that her right shoulder injury manifested within forty-eight hours of her vaccination.

## I.   Procedural History

---

[1]This Fact Ruling shall be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  In accordance with Vaccine Rule 18(b), a party has 14 days to identify and move to delete medical or other information that satisfies the criteria in § 300aa-12(d)(4)(B).  Further, consistent with the rule requirement, a motion for redaction must include a proposed redacted Fact Ruling. If, upon review, I agree that the identified material fits within the requirements of that provision, such material will be deleted from public access.

[2] The Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-10 et seq. (hereinafter "Vaccine Act," "the Act," or "the Program").  Hereafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

Petitioner filed her petition on March 31, 2017. Pet. She filed medical records, including a vaccination record, on April 8, 2017. Pet'r's Exs. 1–4, ECF No. 9. Petitioner then submitted her affidavit and statement of completion on April 25, 2017. Pet'r Ex. 5, ECF No. 12-1; ECF No. 13. This case was assigned to the Special Processing Unit, and an initial status conference was held on May 11, 2017. Min. Entry, docketed May 11, 2017; Scheduling Order, ECF No. 14. Petitioner filed updated medical records on May 15, 2017. Pet'r Ex. 6, ECF No. 15-1.

On October 20, 2017, Respondent filed a status report indicating that some medical records remained outstanding. ECF No. 20. Petitioner filed medical records and a status report on November 22, 2017. Pet'r's Ex. 7, ECF No. 22-1; ECF No. 23. On December 22, 2017, Petitioner filed additional medical records and a statement of completion. Pet'r's Ex. 8, ECF No. 26-1; ECF No. 27.

On March 26, 2018, Respondent filed his Rule 4(c) report. Resp't's Report, ECF No. 31. Respondent stated that this claim did not qualify as a Table SIRVA claim because "[P]etitioner's vaccination record places administration of the alleged causal influenza vaccination in her left shoulder, while [P]etitioner asserts she suffered SIRVA in her right shoulder." *Id.* at 11. He further stated that "[P]etitioner's medical records suggest a prior history of shoulder pain." *Id.* Respondent also argued that because "contemporaneous medical records do not reflect that [P]etitioner attributed any shoulder pain to her vaccination until January 21, 2016, . . . [when] she placed onset of her shoulder pain as occurring three weeks after her vaccination." *Id.* at 11. He continued that "the records do not support a finding that there was an appropriate temporal relationship between [P]etitioner's November 5, 2015 vaccination and her alleged shoulder injury." *Id.* at 11–12. Thus, Respondent recommended against compensation. *Id.* at 12. Respondent also requested additional medical records. *Id.* at 5 n.2, 6 n.4, 9 n.8.

This case was reassigned to me on May 30, 2018. ECF Nos. 32–33. Petitioner filed additional medical records on August 10, 2018 and September 24, 2018. Pet'r's Exs. 9–11, ECF Nos. 35, 37. Petitioner filed a "patient history report" from Rite Aid Pharmacy as well as supplemental affidavits on February 4, 2019. Pet'r's Exs. 12–13, ECF No. 44.

On February 8, 2019, I ordered Petitioner to file "any additional evidence that establishes that she has previously received vaccines, injections, or any other like treatment in her right deltoid." Scheduling Order at 1, ECF No. 45. I also ordered Respondent to file a status report "identif[ying] the specific records that discuss Petitioner's shoulder pain history prior to the vaccination at issue." *Id.* at 2. Respondent filed his status report on March 1, 2019, and Petitioner filed a medical record regarding previous vaccinations on March 25, 2019. ECF No. 46; Pet'r's Ex. 14, ECF No. 47. Petitioner filed additional medical records on April 25, 2019. Pet'r's Exs. 15–16, ECF No. 48.

On April 30, 2019, I held a status conference in this case. Min. Entry, docketed May 23, 2019. Petitioner "conceded that apart from her own statements to her treating physicians and those made in her affidavits, she is unable to identify other evidence to support her claim that the vaccine was administered in her right deltoid." Order, ECF No. 49. I ordered Petitioner to file additional evidence regarding her vaccination site. *Id.* Petitioner filed a motion for discovery in order to

"serve a subpoena upon [Petitioner's primary care provider ("PCP"), Dr. Megan Brzezinski] for purposes of taking a deposition." ECF No. 53 at 2. I granted Petitioner's motion. Order, ECF No. 55. Petitioner filed the deposition transcript on December 23, 2019. Pet'r's Ex. 17, ECF No. 59.

I held a status conference in this case on August 20, 2020. Min. Entry, docketed Aug. 20, 2020. During the conference, "the parties agreed a ruling on the factual issues is necessary[ and] . . . consented to a fact ruling on the record in the absence of a hearing . . . ." Scheduling Order, ECF No. 60. Petitioner filed her brief addressing factual issues on October 5, 2020. Pet'r's Br. Respondent filed his response on December 21, 2020. Resp't's Resp. Petitioner filed a reply on January 14, 2021. Pet'r's Reply, ECF No. 66.

This matter is now ripe for consideration.

## II.      Summary of Relevant Evidence

### a.    Medical Records

On November 5, 2015, Petitioner presented to Dr. Brzezinski at Sparrow Medical Group – Pottersville to follow up on an asthma flare she reported on October 30, 2015. Pet'r's Ex. 2 at 64, ECF No. 9-2. Petitioner also reported stomach problems during this appointment. *Id.* Dr. Brzezinski directed Petitioner to follow up in two weeks to recheck her asthma. *Id.* at 65. While at Sparrow Medical Group on November 5, 2015, Petitioner received the flu vaccine at issue. Pet'r's Ex. 1 at 1, ECF No. 9-1; Pet'r's Ex. 2 at 68. Petitioner's "[i]mmunization [s]ummary" indicates that this flu vaccine was administered "IM/LD[,]" or intramuscularly in her left deltoid, by medical assistant Dawn England. Pet'r's Ex. 1 at 1.

On November 9, 2015, four days post flu vaccination, Petitioner returned to Dr. Brzezinski at Sparrow Medical Group complaining of a recurrence of knee pain. Pet'r's Ex. 2 at 72. The assessment included "[p]rimary osteoarthritis[3] of right knee" and "[b]ilateral knee pain." *Id.* at 73. The record from this visit does not indicate that Petitioner reported shoulder pain. *See id.* at 72–82.

On November 23, 2015, eighteen days post vaccination, Petitioner visited Sparrow Medical Group "to [follow up] on heartburn[.]" Pet'r's Ex. 7 at 1, ECF No. 22-1. Petitioner also reported shoulder pain. *Id.* Petitioner stated that she "fell a few years ago . . . onto cement after walking her dog down some stairs." *Id.* She indicated that her pain had "been chronic since then[ but that it had been] recently acting up in both shoulder [sic] and trapezius muscles[4][ and] aching." *Id.* Petitioner

---

[3] Osteoarthritis is "a noninflammatory degenerative joint disease seen mainly in older persons, characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane." *Osteoarthritis*, DORLAND'S MEDICAL DICTIONARY ONLINE [hereinafter "DORLAND'S"], https://www.dorlandsonline.com (last visited Jan. 24, 2022).

[4] The trapezius muscle is used to elevate the shoulder. *Musculus Trapezius*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 24, 2022).

noted that she "[h]as fibromyalgia[5] and wonders about arthritis[]"[6] and reported that she had "[t]rouble lifting to the side on both sides." *Id.* She reported being able to wash her hair and reach her back pockets but experiencing difficulty when placing items in cupboards. *Id.* Petitioner reported that "[s]he also has some neck pain and stiffness and wonders if this could be related." *Id.* She did not report numbness or tingling but noted having "some weakness in the arms." *Id.* Dr. Brzezinski noted that both Petitioner's right shoulder and left shoulder were "[n]ormal" on exam. *Id.* at 1–2. However, Dr. Brzezinski also noted that Petitioner had "bilateral shoulder pain with [the] Hawkins Kennedy impingement test,[7] subscap[ularis][8] liftoff test, resisted IR and ER, and bilateral empty can tests." *Id.* at 2. Dr. Brzezinski continued, without specifying whether symptoms were bilateral, that Petitioner experienced "[p]ain with abduction and horizontal flexion." *Id.* Dr. Brzezinski noted that Petitioner had "[n]o pain with palpation over [the acromioclavicular] joint[9] or subacromial space[]" but was positive for trapezius tenderness. *Id.* Petitioner's Spurling test[10] was negative bilaterally, but she had weakness with subscapular liftoff. *Id.*

During this appointment, Petitioner had X-rays of her right and left shoulders. *Id.* at 212–13. The "[h]istory is listed as "[b]ilateral shoulder pain." *Id.* The radiologist's impression of Petitioner's right shoulder was "[n]o acute abnormality in the right shoulder. Mild prominence[11] in the distance at the acromioclavicular joint as compared to the left." *Id.* at 212. The left shoulder X-ray was negative for any abnormality. *See id.* at 213.

---

[5] Fibromyalgia is "pain and stiffness in the muscles and joints that either is diffuse or has multiple trigger points." *Fibromyalgia*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 24, 2022).

[6] Arthritis is "inflammation of a joint." *Arthritis*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 24, 2022).

[7] An impingement test checks "for rotator cuff tendinitis." *Impingement Test*, DORLAND'S, https://www.dorlandsonline.com (last visited Feb. 7, 2022). The rotator cuff is "a musculotendinous structure about the capsule of the shoulder joint . . . ." *Rotator Cuff*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 27, 2022).

[8] The subscapularis muscle "rotates [the] humerus medially[.]" *Musculus Subscapularis*, DORLAND'S, https://www.dorlandsonline.com (last visited Feb. 7, 2022). The humerus is "the long bone of the arm that articulates with the scapula at the shoulder and with the radius and ulna at the elbow[.]" *Humerus*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 24, 2022). The scapula, or shoulder blade, is "the flat, triangular bone in the back of the shoulder, articulating with the ipsilateral clavicle and humerus[.]" *Scapula*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 24, 2022). The clavicle is "a long bone[] . . . that articulates with the sternum and scapula, forming the anterior portion of the pectoral girdle on either side[.]" *Clavicle*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 24, 2022).

[9] The acromioclavicular joint is "the synovial joint between the acromion of the scapula and the acromial extremity of the clavicle." *Articulatio Acromioclavicularis*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 24, 2022). The acromion is "the lateral extension of the spine of the scapula, projecting over the shoulder joint and forming the highest point of the shoulder[.]" *Acromion*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 24, 2022).

[10] Used to test for cervical radiculopathy, the Spurling test involves "the examiner press[ing] down on the top of the head while the patient rotates the head laterally and into hyperextension[.]" *Spurling Test*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 24, 2022). Cervical radiculopathy is radiculopathy of cervical nerve roots, often with neck or shoulder pain[.]" *Cervical Radiculopathy*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 24, 2022).

[11] Prominence refers to "a protrusion or projection[.]" *Prominence*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 24, 2022).

On December 3, 2015, Petitioner presented to Ms. Jenny Hall[12] at Michigan Orthopedic Center for hip pain that she had experienced over the past five years. Pet'r's Ex. 11 at 22, 53, ECF No. 37-1. The record does not indicate that Petitioner reported shoulder pain during this visit. *See id.* at 22–23, 53–54. On December 10, 2015, Petitioner returned to Michigan Orthopedic Center and presented to Dr. Charles Taunt. *Id.* at 19. Petitioner reported "bilateral knee pain[ that s]he has had . . . for several months . . . after a fall at home down a flight of stairs." *Id.* Petitioner did not complain of shoulder pain during the treatment portion of this visit. *See id.* at 19–21. However, on an intake form dated December 10, 2015, Petitioner noted pain in "left and right shoulders[,]" as well as neck, foot, back, hip, and arm pain, when asked to "[d]escribe any medical issues not listed" on the intake form. *Id.* at 49. Petitioner returned to Michigan Orthopedic Center regarding her knee problems on January 11, 2016, but did not indicate that she was experiencing shoulder pain. *See id.* at 16–18.

On January 21, 2016, Petitioner returned to Dr. Brzezinski for a well-woman physical exam. Pet'r's Ex. 2 at 83. She reported shoulder pain during this visit. *Id.* Dr. Brzezinski noted "left[13] shoulder pain since getting flu shot, X [eight] weeks . . . ." *Id.* Petitioner reported that she did not do previously ordered physical therapy because of "this severe shoulder pain." *Id.* Petitioner complained of "popping in [her] bicep area." *Id.* She stated that taking Motrin two to three times per day improved her symptoms. *Id.* Under "[r]eview of [s]ystems[,]" Dr. Brzezinski stated that Petitioner was "[p]ositive for arthralgias[14] (R shoulder) and neck pain." *Id.* at 84. A physical exam revealed "decreased range of motion and tenderness[]" in Petitioner's right shoulder. *Id.* at 85. However, Petitioner was noted to have "[n]ormal movement of all limbs, no joint swelling." *Id.* Petitioner's right shoulder Spurling test was negative, but she had positive Hawkins Kennedy and empty can tests. *Id.* Dr. Brezezinski's assessment included "[s]houlder pain, right" as well as fibromyalgia, osteoarthritis of both knees, and tobacco use. *Id.* at 86. During this appointment, Petitioner declined a tetanus vaccine "due to shoulder pain[.]" *Id.* at 83.

Dr. Brzezinski ordered an MRI of Petitioner's right shoulder, which was performed   on February 5, 2016. *Id.* at 86, 104. The "[h]istory" is listed as "[r]ight shoulder pain [for eight] weeks." *Id.* at 104. The impression included "[f]ull thickness tear far anterior, far distal *supraspinatus* tendon[,]"[15]" "[m]oderate acromioclavicular osteoarthritis[,]" "[t]endinopathy[16] and medial subluxation[17] of the" biceps tendon,   "[t]endinopathy and interstitial tear in the infraspinatus tendon[,]" "[t]endinopathy in  . . . [the]subscapularis tendon[,]" "[s]uperior labral

---

[12] The record does not indicate whether Ms. Hall is a physician, nurse practitioner, or physician's assistant. *See* Pet'r's Ex. 11 at 22–23.

[13] In her deposition, Dr. Brzezinski clarified that she believes her reference to Petitioner's left shoulder rather than right shoulder may have been a typographical error. Pet'r's Ex. 17 at 21.

[14] Arthralgia is "pain in a joint[.]" *Arthralgia*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 24, 2022).

[15] The supraspinatus muscle abducts the humerus. *Musculus Supraspinatus*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 25, 2022).

[16] Tendinopathy is "any pathologic condition of a tendon." *Tendinopathy*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 25, 2022).

[17] Subluxation is "an incomplete or partial dislocation." *Subluxation*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 25, 2022).

tear[,]" and "[s]mall subacromial and subdeltoid fluid." *Id.* at 104–05. The assessment included a non-traumatic rotator cuff tear and a labral tear of Petitioner's right shoulder. *Id.* at 105.

Petitioner followed up with Dr. Brzezinski on February 19, 2016. *Id.* at 95. Petitioner reported that she was experiencing "awful" pain and taking Motrin and sometimes Flexeril[18] and Ultram.[19] *Id.* Dr. Brzezinski wrote that Petitioner suffered from "[p]ain going down [her] arm to [her] wrist[]" as well as decreased range of motion and "pain with putting something on [a] table next to her." *Id.* Right empty can, O'Brien, and SLAP[20] tests were positive. *Id.* at 96. The assessments were labral tear of right shoulder, right supraspinatus tendon tear, and primary osteoarthritis of both knees. *Id.* Petitioner was referred to an orthopedic surgeon. *See id.*

On February 29, 2016, Petitioner presented to Dr. Michael Shingles, an orthopedist, at Michigan State University's ("MSU") Sports Medicine Clinic for evaluation of her right shoulder. Pet'r's Ex. 3 at 55, ECF No. 9-3. An X-ray of Petitioner's right shoulder performed that day revealed "[a]cromial clavicular joint osteoarthritis, including small undersurface osteophytes.[21] Curved acromial undersurface." *Id.* at 50. It also showed "[f]ew small subcortical cysts in the greater tuberosity, not specific but often seen secondary to chronic adjacent rotator cuff abnormality[]" but "[n]o acute or aggressive osseous abnormality in the right shoulder . . . ." *Id.* Dr. Shingles stated that Petitioner had "a complete rotator cuff tear with some retraction. It is only around 7 mm to a centimeter in size anteriorly, but she has subluxation of her biceps tendon. She has horrible AC joint arthritis." *Id.* at 55. He noted that Petitioner suffered from "significant biceps tendon pain" and had "empty can and impingement type findings." *Id.* Dr. Shingles's assessment also included bicipital tendinitis of Petitioner's right shoulder and superior glenoid labrum lesion of her right shoulder. *Id.* at 53. Dr. Shingles recommended surgical intervention. *Id.* at 55.

On March 22, 2016, Petitioner returned to Dr. Brzezinski. Pet'r's Ex. 2 at 103. Petitioner was hesitant to undergo surgery but reported that "her shoulder [was] acting up all the time[.]" *Id.* Petitioner quested whether "the pain [was] nerve damage because of the shooting pain down into her hand." *Id.* She reported that her pain was "sharp and shooting or a dull ache in the bicep area[]" and that she had "[s]ome weakness in her elbow or shoulder at times[ but n]o weakness in [her] hand." *Id.* Dr. Brzezinski referred Petitioner to physical therapy and prescribed a gel. *Id.* at 105.

---

[18] Flexeril, or cyclobenzaprine hydrochloride, is used as a muscle relaxant. *Flexeril*, DORLAND'S, https://www.dorlandsonline.com (last visited Feb. 16, 2022); *Cyclobenzaprine Hydrochloride*, DORLAND'S, https://www.dorlandsonline.com (last visited Feb. 16, 2022).

[19] Ultram, or tramadol hydrochloride, is "an opioid analgesic used for the treatment of moderate to moderately severe pain following surgical procedures and oral surgery[.]" *Ultram*, DORLAND'S, https://www.dorlandsonline.com (last visited Feb. 16, 2022); *Tramadol Hydrochloride*, DORLAND'S, https://www.dorlandsonline.com (last visited Feb. 16, 2022).

[20] A SLAP lesion is an "injury involving the superior glenoid labrum and attachment of the biceps brachii[] . . . ." *SLAP Lesion*, DORLAND'S, https://www.dorlandsonline.com (last visited Feb. 7, 2022). The glenoid labrum is "a ring of fibrocartilage attached to the rim of the glenoid fossa of the scapula . . . ." *Labrum Glenoideum*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 27, 2022). The glenoid fossa is "a depression in the lateral angle of the scapula for articulation with the humerus[.]" *Glenoid Fossa*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 27, 2022).

[21] An osteophyte is "a bony excrescence or osseous outgrowth." *Osteophyte*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 27, 2022).

On April 1, 2016, Petitioner visited Dr. Brzezinski for an upper respiratory infection, chest pain, and shoulder pain. *Id.* at 115. Dr. Brzezinski advised Petitioner to follow up with Dr. Shingles to possibly receive an MRI. *Id.* Dr. Brzezinski "reassured [Petitioner] that her arm pain is most likely referred from her rotator cuff tear." *Id.* Petitioner received a Toradol[22] injection in her right deltoid. *Id.* at 121.

On April 27, 2016, Petitioner presented to physician's assistant ("PA") Michael Straus at MSU's Sports Medicine Clinic with "right shoulder pain since November 2015." Pet'r's Ex. 3 at 48. Petitioner reported that "[s]he had no pain or problems with this shoulder for many years." *Id.* Petitioner noted that she "[was] unsure when she got the rotator cuff tear or the arthritis, but she [did] not think that is what is causing her pain." *Id.* She reported that "[s]he did get a flu shot last fall, and that is when her pain started." *Id.* Petitioner thought that "this [was] nerve pain that [was] coming from her neck, her shoulder, and her arm, and she would really like to see a neurologist to have this looked at from a nerve pain standpoint." *Id.* Petitioner also discussed her knee pain. *Id.*

On May 24, 2016, Petitioner presented to Dr. Brzezinski following a cervical[23] spine MRI. Pet'r's Ex. 2 at 130. Petitioner reported that she had been experiencing "[right] shoulder pain radiating down arm[ and feeling a] tingling sensation." *Id.* Petitioner "also ha[d] pain in her upper arm, not in the shoulder, that was precipitated after her tetanus was given." *Id.* The assessment from this visit included cervical degenerative disc disease,[24] neuroforaminal stenosis[25] of the cervical spine, thyroid nodule, right arm pain, and primary osteoarthritis of both knees. *Id.* at 132.

On June 14, 2016, Petitioner returned to Sparrow Medical Group for an MRI of her right humerus. *Id.* at 237. The radiologist stated that Petitioner's rotator cuff tendons were better evaluated on her previous right shoulder MRI but noted a "small glenohumeral joint[26] effusion.[27]" *Id.* He noted that "the musculotendinous structures of the right upper arm are grossly intact." *Id.* Petitioner visited Dr. Brzezinski again on June 24, 2016, to follow up on right shoulder pain. *Id.* at 138. Dr. Brzezinski stated that Petitioner's pain was "most likely referred from her [rotator cuff] issues in that shoulder." *Id.*

---

[22] Toradol is ketorolac tromethamine, which is "a nonsteroidal antiinflammatory drug administered intramuscularly, intravenously, or orally for short-term management of pain[.]" *Toradol*, DORLAND'S, https://www.dorlandsonline.com (last visited Feb. 7, 2022); *Ketorolac Tromethamine*, DORLAND'S, https://www.dorlandsonline.com (last visited Feb. 7, 2022).

[23] Cervical "pertain[s] to the neck[]" or "to the neck or cervix of any organ or structure." *Cervical*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 27, 2022).

[24] Spondylosis, or degenerative disc disease, refers to "ankylosis of a vertebral joint[]" and "degenerative spinal changes due to osteoarthritis." *Spondylosis*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 27, 2022).

[25] Stenosis is "an abnormal narrowing of a duct or canal[.]" Spondylosis, or degenerative disc disease, refers to "ankylosis of a vertebral joint[]" and "degenerative spinal changes due to osteoarthritis." *Stenosis*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 27, 2022).

[26] The glenohumeral joint is "formed by the head of the humerus and the glenoid fossa of the scapula." *Glenohumeral Joint*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 27, 2022).

[27] Effusion is "the escape of fluid into a part or tissue, as an exudation or a transudation[]" or "an effused material . . . ." *Effusion*, DORLAND'S, https://www.dorlandsonline.com (last visited Jan. 27, 2022).

Petitioner returned to Dr. Shingles on July 13, 2016. Pet'r's Ex. 3 at 7. Dr. Shingles wrote that Petitioner's "[r]ight shoulder ha[d] been bothering her for a while. She feels that it was a [t]etanus shot that she had that caused her shoulder pain. It has been around a year and it is finally resolving and that the pain in much better." *Id.* Petitioner reported that she was still experiencing pain in the subacromial region during some activities. *Id.* Dr. Shingles administered a subacromial injection. *Id.* Petitioner received additional injections in her right shoulder from PA Straus on February 21, 2017, March 30, 2017, and July 18, 2018. *Id.* at 58, 62; Pet'r's Ex. 10 at 4, 20, 25, ECF No. 35-2.

On March 18, 2018, Petitioner presented to Dr. Shingles for "re-evaluation of her [right] shoulder pain that has been ongoing for multiple years." Pet'r's Ex. 15 at 8, ECF No. 48-1. The record states, "[c]orrection for [Petitioner's] medical records: [Petitioner] was seen [eight months] post[] flu shot that was done in November 2015 for initial evaluation [on July 13, 2016] for her [right] shoulder pain." *Id.* Dr. Shingles's assessment included a "[f]ull thickness rotator cuff tear[,]" "[i]mpingement syndrome[28] of shoulder region[,]" and "[p]ain of [the] right shoulder joint." *Id.* at 9. He expressed concern that Petitioner's rotator cuff tear had worsened and recommended that she have an MRI. *Id.* Petitioner underwent a repeat right shoulder MRI on March 23, 2019, and Dr. Shingles assessed Petitioner with a "[f]ull thickness rotator cuff tear" and a "[r]upture of tendon biceps– Right[.]" *Id.* at 2, 5. Dr. Shingles recommended surgical intervention, but Petitioner declined. *Id.* at 5.

On March 20, 2019, Petitioner returned to Dr. Brzezinski for neck and back pain. Pet'r's Ex. 16 at 1, ECF No. 48-2. Dr. Brzezinski noted that "[Petitioner] wants to clarify that at the visit [on November 9, 2015,] she did complain of right shoulder pain at that time. On [November 23, 2015] she came in, [they] addressed right shoulder pain but that was not a direct injury related to the fall onto her knees." *Id.* Dr. Brzezinski continued, stating, "[t]he fall that caused the knee pain did not lead to the shoulder pain. [Petitioner] had a flu shot [four] days prior and her right shoulder pain was new after that immunization." *Id.*[29]

### b.   Affidavits and Declarations

#### 1.   Petitioner's Affidavit

Petitioner filed her sworn affidavit on April 25, 2017. *See* Pet'r's Ex. 5 at 3, ECF No. 12-1. Petitioner recalled receiving a flu vaccine on November 5, 2015. *Id.* ¶ 1. Petitioner stated that

---

[28] Impingement syndrome is "a type of overuse injury with progressive pathologic changes resulting from mechanical impingement by the acromion, coracoacromial ligament, coracoid process, or acromioclavicular joint against the rotator cuff[.]" *Impingement Syndrome*, DORLAND'S, https://www.dorlandonline.com (last visited Jan. 27, 2022).

[29] While I have reviewed all of the records filed in this case, I have addressed only the medical records I have deemed relevant to this Fact Ruling. *Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision.") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.*, 527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

she "was about to receive the flu shot from the medical assistant when [Petitioner] noticed [the medical assistant] was going to put the injection in [Petitioner's] left arm." *Id.* Petitioner continued that she "told [the medical assistant] to use the other arm, because [Petitioner] write[s] left-handed and [she] did not want to have pain in [her] dominant arm from the flu shot." *Id.* Petitioner stated that "[t]he medical assistant had already marked down in the computer that she was administering the vaccine in the left arm." *Id.* Petitioner noted that she "mentioned that [the medical assistant] should make the change[]" but that the medical assistant "said it was 'no big deal,' and left the incorrect arm listed in the computer record." *Id.* Petitioner stated that she received the vaccination in her right arm as she had requested. *Id.* She recalled that the medical assistant "said that she always puts down the left arm as the arm to receive vaccinations because, like [Petitioner], [the medical assistant] is left-handed and assumes almost everyone else is right[-]handed." *Id.*

Petitioner stated that she "noticed some pain and stiffness in [her] right bicep and right shoulder[]" on "[t]he day of the flu shot[.]" *Id.* ¶ 2. She recalled that "[t]he pain [she] had from the flu shot began to get progressively worse, day by day." *Id.* Petitioner stated that she made an appointment with Dr. Brzezinski for shoulder and knee pain shortly after her vaccination. *Id.* ¶ 3. Petitioner noted that she "could hardly walk" and saw Dr. Brzezinski on November 9, 2015. *Id.* Petitioner stated that she "told [Dr. Brzezinski] about the pain in [her] right arm." *Id.* Petitioner recalled telling Dr. Brzezinski that she "thought it was from the flu shot and the pain was not going away." *Id.* Petitioner asserted, however, that "[b]ecause [her] knees were in so much pain that day, Dr. Brzezinski's main focus was on [Petitioner's] knees." *Id.* Petitioner claimed that when she "mentioned the pain in [her] arm, [Dr. Brzezinski] told [Petitioner] to make another appointment in a week if the arm pain did not go away." *Id.* Petitioner recalled that her "arm pain continued so [she] made an appointment as soon as [she] could[]" and that she returned to Dr. Brzezinski on November 23, 2015. *Id.*

Petitioner described her pain, which she stated "worsened and started to become unbearable[]" and which continued to the date of this affidavit. *Id.* ¶¶ 4–8. Petitioner recalled telling Dr. Shingles that she "had never experienced such horrible pain in [her] life[]" and that her pain "started after the flu shot." *Id.* ¶ 5. Recalling that Dr. Shingles wanted to operate on her right shoulder, Petitioner stated that she "asked Dr. Shingles if the operation would make the pain go away, because [she] had never had pain before in [her] right arm and shoulder." *Id.* Petitioner maintained that "[t]he flu shot has affected [her] life by causing daily pain in [her] right arm." *Id.* ¶ 8.

## 2. Petitioner's Supplemental Affidavit and Witness Declarations

Petitioner filed an exhibit containing her supplemental affidavit as well as various witness declarations, affidavits, and letters on February 4, 2019. Pet'r's Ex. 13, ECF No. 44-2. All of the documents include typed, rather than handwritten, signatures. *See id.*

In her supplemental affidavit, Petitioner repeated some of the points she made in her initial affidavit, including that she experienced pain in her right arm and shoulder the day of her flu vaccination and that she requested the vaccine in her right arm because she is left-handed. *See id.* at 1. She added that she "spoke to [her] husband the night of the vaccination and told him [she]

was having pain in [her] shoulder. He told [her] it would probably go away in a couple of days[]" but that her pain worsened. *Id.* Petitioner further recalled "having a conversation with [her] daughter, Briana, the morning after [her] shot was given, and telling [Briana] that [Petitioner's] arm was in really bad pain." *Id.* Petitioner noted that her daughter accompanied her to her November 9, 2015 appointment with Dr. Brzezinski. *Id.* Discussing her November 23, 2015 appointment with Dr. Brzezinski, Petitioner clarified that although "[t]he doctor's note . . . indicates that [she] had been 'chronic' since having a fall a couple years earlier[, t]he chronic pain the doctor describes is much different from the pain [Petitioner] felt in [her] right shoulder on November 5, 2015 . . . ." *Id.* Petitioner stated that by November 23, 2015, she "was having excruciating sharp pain like nothing [she] had ever experienced before and that is what [she] told [her] physician." *Id.* Petitioner electronically signed this document on January 4, 2019. *See id.* at 2.

Petitioner filed a declaration from her daughter, Ms. Briana Kabelitz [hereinafter "Ms. Kabelitz"], which was electronically signed but not dated. *See id.* at 3–4. Ms. Kabelitz stated that she "remember[s Petitioner] getting the flu shot because [Ms. Kabelitz] was there with [Petitioner] at Dr. [] Brzezinski's office. [Petitioner] got her flu shot in her right arm." *Id.* at 3. Ms. Kabelitz continued that "[Petitioner] started complaining of pain in her right upper arm and shoulder the next morning when she was emptying the trash can in the living room. She said it was hurting more than usual after getting a flu shot." *Id.* Ms. Kabelitz recalled Petitioner telling her the morning after the vaccination that Petitioner "thought her upper arm where the shot was given felt like her muscle had been damaged by the flu shot because the pain was so bad." *Id.* Ms. Kabelitz stated that Petitioner "had never complained about pain in her right shoulder before this vaccination." *Id.* She noted that "[t]he pain [Petitioner] has gone through since [her November 5, 2015 flu vaccination] was like none she had never [sic] experienced from any flu shot before." *Id.*

Ms. Kabelitz further recalled accompanying Petitioner to an appointment with Dr. Brzezinski "a week or so later." *Id.* Ms. Kabelitz stated that Petitioner "told Dr. Brzezinski that she thought the flu shot was causing the pain in her right arm and shoulder. She also had severe pain in her knees. [Petitioner] was in so much knee pain she was having trouble walking." *Id.* Ms. Kabelitz noted that Petitioner received X-rays during this appointment. *Id.* Ms. Kabelitz stated that "[Petitioner] has had osteoarthritis for a long time in both knees but that has never bothered her right arm." *Id.*

Further, Ms. Kabelitz discussed Petitioner's continuing pain and its impact on her activities. *Id.* at 3–4. Ms. Kabelitz stated that "[t]he symptoms of pain from getting the flu shot was something [Petitioner] talked about almost every day since getting the flu shot on November 5, 2015." *Id.* at 3. Ms. Kabelitz continued that "[Petitioner] complains almost daily that she felt the pain in her arm is due to the flu shot. She has said many times that she can feel where the flu shot was given if she touches her arm and presses it." *Id.* at 3–4. Ms. Kabelitz stated that she is "with [Petitioner] every day and [] know[s] how much pain she is in." *Id.* at 4. Ms. Kabelitz's declaration is electronically signed but not dated. *See id.*

Petitioner also submitted a declaration from her husband, Mr. Rodney Kabelitz. *Id.* at 5. Mr. Kabelitz stated that he "know[s] that [Petitioner] has had pain in her right shoulder ever since she got her flu shot on November 5, 2015. She complained of pain in her right shoulder and arm

immediately after receiving the vaccination." *Id.* He noted that Petitioner "had never complained about pain like that in her right arm before." *Id.* Mr. Kabelitz continued that "[t]he pain was high up on [Petitioner's] right shoulder where the flu shot was given." *Id.* He recalled telling Petitioner on the night of her vaccination that her pain would dissipate soon. *Id.* He noted, however, that "the pain did not go away. [Petitioner] complained the next day[,] November 6, 2015, that the pain was actually getting worse." *Id.* Mr. Kabelitz stated that he told Petitioner to make an appointment with Dr. Brzezinski. *Id.* He recalled that Petitioner's pain worsened and required medication to be bearable. *Id.* Mr. Kabelitz also noted that Dr. Shingles wanted to perform surgery but that Petitioner declined because "[Dr. Shingles] said he did not know if she would get better from the surgery." *Id.* Mr. Kabelitz recalled that Petitioner received a cortisone injection but that it did not help much. *Id.* He stated that "[i]t ha[d] been three years since [Petitioner] got the flu shot[,] and [she] has not recovered from this. She is still in pain every day." *Id.* He asserted that, because of the pain, Petitioner could not get a job or do everyday activities. *See id.* at 5–6. He also noted that "[P]etitioner says she can tell where the shot was given if she touches where the flu shot was given." *Id.* at 6. He noted that Petitioner declined physical therapy "because any repetition of movement makes her arm feel worse." *Id.* Mr. Kabelitz noted that he had "been with [P]etitioner for [thirty-eight] years and ha[d] never seen her be in so much pain." *Id.* He stated that Petitioner "never complained of her right arm and shoulder hurting before the flu shot[]" and that he believes the flu vaccine caused Petitioner's injury. *Id.* The declaration was electronically signed and dated January 31, 2019. *Id.*

Petitioner also submitted a letter from Mr. Brian Perry. *Id.* at 7. Mr. Perry stated that he had known Petitioner for more than thirty-eight years. *Id.* He stated that "[Petitioner] told [him] about her flu shot injury a couple a [sic] months after she received her flu shot in November of 2015." *Id.* He continued that "[Petitioner] told [him] that her arm hurt after she got the flu shot and the pain kept getting worse, she told [him] that her right arm and right shoulder hurt so bad after she got the flu shot that she had a hard time lifting anything that was over a couple pounds." *Id.* He further indicated that Petitioner had discussed the impact of her right arm and shoulder pain on her ability to be employed and perform everyday activities. *See id.* The letter was electronically signed and dated December 5, 2018. *Id.*

Petitioner filed a letter from Ms. Elizabeth Grace. *Id.* at 8. Ms. Grace stated that she had "known [Petitioner] since [they] were eight years old[]" and that she "always thought of [Petitioner] as a person of good character and a person that [Ms. Grace] trust[s]." *Id.* Ms. Grace wrote that Petitioner "told [her] a few months after [Petitioner] got the flu shot about what happened after she received her vaccination." *Id.* Ms. Grace continued that Petitioner reported experiencing "terrible pain in her right arm and shoulder that began right after she received the shot. She said the pain got progressively worse and she could not get any relief." *Id.* Ms. Grace stated that she "know[s] that [Petitioner] has been going thru [sic] a lot of pain in her right arm and right shoulder because [they] ha[d] discussed this many time [sic] on the phone and in person." *Id.* The letter was electronically signed and dated January 29, 2019. *Id.*

Petitioner submitted a declaration from Ms. Janice Boron. *Id.* at 9. Ms. Boron stated that she has known Petitioner for more than twenty years. *Id.* Ms. Boron stated that Petitioner told her about Petitioner's "vaccine injury in her right arm that happened on November 5, 2015." *Id.* Ms. Boron continued that she spoke with Petitioner "a couple months after she got the flu vaccine."

*Id.* Ms. Boron noted that Petitioner reported "that her right arm and shoulder had been in pain ever since she got the flu shot." *Id.* Ms. Boron stated that Petitioner never complained about right arm or shoulder pain before this vaccination. *Id.* Ms. Boron noted that she and Petitioner had "had many conversations about her arm and shoulder pain[]" as well as its impact on her life. *Id.* The declaration is electronically signed but not dated. *Id.*

Petitioner also filed a declaration from her neighbor Ms. Neva Donley, who is also a friend of Petitioner's daughter, Ms. Kabelitz. *Id.* at 10. Ms. Donley stated that Petitioner told her "what has been going on with her concerning the pain in her right arm and shoulder since she got the flu shot on November 5, 2015." *Id.* She recalled that "[a] couple of weeks after [Petitioner] got the flu shot, [she] told [Ms. Donley] that [Petitioner's] arm and shoulder were really hurting her and that the pain began almost immediately after she got the flu shot in November." *Id.* Ms. Donley noted that she had never discussed arm or shoulder pain with Petitioner prior to this vaccination. *Id.* Ms. Donley stated that she "[knew] that [Petitioner] is in pain still from the flu shot because [Ms. Donley] ha[s] been around [Petitioner] when she says she has pain in her arm." Ms. Donley noted that "[s]ometimes [Petitioner] yells because the pain is so intense. She has a shooting sharp pain in her right shoulder[,] and she screams out in pain." *Id.* Ms. Donley stated that she sees Petitioner often and has noticed her pain's impact on her activities. *See id.* The declaration is electronically signed and dated February 4, 2019. *Id.* at 11.

Petitioner submitted an affidavit from Mr. Sonno Polazzo, another neighbor. *Id.* at 12. Mr. Polazzo stated that he had known Petitioner for three years and "had many conversations [with her] about what happened to her after she got her flu shot in November of 2015." *Id.* He stated that Petitioner "told [him] when she got her flu shot that she had immediate pain in her right arm that would not go away. [She] told [him] she believed that the flu shot injured her arm because this is when her pain started." *Id.* Mr. Polazzo also discussed Petitioner's continuing difficulties with her pain. *Id.* Mr. Polazzo's affidavit is electronically signed and dated December 3, 2018. *Id.*

### 3.  Deposition of Dr. Brzezinski

Dr. Brzezinski appeared for a deposition on November 20, 2019. Pet'r's Ex. 17 at 1, ECF No. 59-1. Dr. Brzezinski stated that she was a family physician who had been treating Petitioner for about four years. *See id.* at 5–6. Dr. Brzezinski knew that Petitioner had received a flu vaccine at Sparrow Medical Group but did not recall when she received it without looking at the medical records. *Id.* at 7. Dr. Brzezinski did not recall anything about Petitioner's November 9, 2015 appointment. *Id.* at 8. After she read a portion of Petitioner's affidavit pertaining to the November 9, 2015 appointment, Dr. Brzezinski stated that it did not refresh her memory but that she "[does not] have any reason to think that [Petitioner's statements are] not true based on the fact that [Petitioner has] been seemingly a truthful person to [Dr. Brzezinski]. Unfortunately, it[ is] just four years ago, so it[ is] very hard to recall that information." *Id.* at 10.

Dr. Brzezinski stated that she had treated Petitioner for orthopedic issues, including knee and shoulder issues, as well as some gastrointestinal issues. *Id.* Regarding Petitioner's shoulder issues, Dr. Brzezinski stated that, based on what she could recall, she had been treating Petitioner for just her right shoulder. *Id.* at 11. Dr. Brzezinski noted that "[i]n the last few years since [Petitioner has] had the persistent right shoulder pain, she has said several times that it was after

her shot." *Id.* Because Dr. Brzezinski and Petitioner had discussed her belief "several times[,]" Dr. Brzezinski stated that "there[ was] no way [she] recall exactly when[] . . . [Petitioner] started saying that." *Id.* Dr. Brzezinski recalled, however, that Petitioner had "repeatedly complained about her right shoulder." *Id.* Dr. Brzezinski was unable to state exactly how many times Petitioner associated her right shoulder problems with her flu vaccination, but Dr. Brzezinski stated that she "want[ed] to say at least two times." *Id.* Dr. Brzezinski was unable to "recall exactly [sic] dates beyond what[ is] in the medical record." *Id.* at 12.

When asked about Petitioner's request to clarify that she complained of right shoulder pain following her vaccination on November 9, 2015, Dr. Brzezinski was able to recall her March 20, 2019 conversation with Petitioner. *Id.* at 12. Dr. Brzezinski indicated that she noted Petitioner's request in the record from the March 20, 2019 appointment but stated that she was not able to independently verify the information in the note. *Id.* at 13. Dr. Brzezinski stated that she did not "have independent recollection as to whether [the facts of the dates and the days after the shot reported by Petitioner are] true or not." *Id.* at 13–14.

Dr. Brzezinski was also asked about the location of Petitioner's vaccination. *See id.* at 14. Dr. Brzezinski stated that "[t]he only information [she] could see was that [the vaccination] was given, and [she] believe[s], documented in the left arm by a medical assistant who is no longer at [the] office. That's . . . just based on looking at the medical record." *Id.* Dr. Brzezinski recalled speaking to Petitioner about which arm she received the vaccination in, but Dr. Brzezinski was unable to state when those conversations occurred. *Id.* She stated, however, that it "seems like it's been in more recent months. But, again, it's been four years, so it's really difficult to remember that information." *Id.* Dr. Brzezinski stated that she did not know if Petitioner experienced problems with her left arm. *Id.* She could only recall treating Petitioner for issues with her right arm. *Id.* at 15. Dr. Brzezinski did not know whether Petitioner was right- or left-handed. *Id.*

Dr. Brzezinski additionally discussed Petitioner's appointment on January 21, 2016, from which a note indicated that Petitioner had been experiencing left shoulder pain since receiving a flu shot eight weeks prior and would like a referral to Dr. Node. *Id.* at 16. When asked who Dr. Node is, Dr. Brzezinski stated that she "believe[s] that was supposed to be Dr. Noud. It might have been a typo." *Id.* at 16–17. Dr. Brzezinski continued that "[w]ithout looking at that note, it could have been the medical assistant who puts information in the HPI section of her . . . note when she's rooming the patient, so [Dr. Brzezinski] will actually incorporate that in [her own] note." *Id.* at 17. Dr. Brzezinski stated that she did not "know whether this was a typo or not regarding the side that was involved. And [she had] never heard of Dr. Node, so [she thought] it might have been Dr. Noud." *Id.* Dr. Brzezinski recalled that Dr. Noud either worked in orthopedic surgery or sports medicine. *Id.*

Petitioner's counsel asked Dr. Brzezinski about the process for getting the information listed under a patient's "HPI" in a medical record. *Id.* Dr. Brzezinski stated that "that's usually where [she] free-text[s]." *Id.* She added, "actually not HPI, it will be the chief complaint. There is a chief complaint section of the medical record that the medical assistant fills in, and that's what [Dr. Brzezinski] will put in [her] note as well . . . ." *Id.* at 17–18. However, while Dr. Brzezinski stated that she had been using this procedure for "the last few years[,]" she could not recall whether she was using it in 2016. *Id.* at 18.

Further discussing this procedure, Dr. Brzezinski stated that she "can do a dot phrase, dot chief, and it will pull it into the note." *Id.* When asked to further clarify this process, Dr. Brzezinski stated that:

> [t]he medical record lets [her] do certain shortcuts where [she] can put a period, a dot, and then [she] can type certain things after. So if [she] wanted to look at a patient's last three blood pressures, [she] say[s] ['dot, BP, last,['] and then there's a little drop-down. And then [she] click[s] on what [she] want[s] and it incorporates that. So [she] can incorporate lots of things that are sort of independent sections of the medical record and, like, medication lists and things like that or a chief complaint.

*Id.* Dr. Brzezinski explained that she "would sometimes do dot chief, and then the medical assistant's notes for that visit would drop into [Dr. Brzezinski's] note for [her] to review. It's just a little easier for [her] to review instead of clicking multiple places in the medical record." *Id.* at 19. She stated that she usually "leave[s] it in a box. It will look like a box on the note." *Id.* Dr. Brzezinski stated she did not know if this is the method she used without seeing the note. *Id.*

Dr. Brzezinski also stated that she usually types as a patient is talking and adds any details that she can remember later and that she also uses "a dictation." *Id.* at 28. She indicated that she hand-writes notes if the visit is of a more "sensitive" type. *Id.* She clarified that she was not using dictation in 2015 but maintained that her method then was "very similar[]" in terms of typing during the visit and filling in details later. *Id.*

Dr. Brzezinski was asked to examine the medical record from Petitioner's January 21, 2016 well-woman physical. *Id.* at 20. Dr. Brzezinski did not remember which portions of the record were written by her and which were written by the medical assistant, but she stated that "it looks like it was written by [Dr. Brzezinski] in the typical place that [she] write[s] in the record." *Id.* at 20–21. Upon examining the record, Dr. Brzezinski concluded that "[b]ased on the fact that [she] focused [her] exam on [Petitioner's] right shoulder and [they] followed up with ordering a right shoulder MRI, [Dr. Brzezinski] believe[s] that might have been a typo under the HPI of left shoulder." *Id.* at 21.

Dr. Brzezinski also discussed the record from Petitioner's appointment on November 23, 2015. *Id.* at 22. Noting that the record stated that Petitioner was experiencing "[t]rouble lifting to the side on both sides," Dr. Brzezinski stated that she "believe[s] what [she] meant was abducting the arms out on both sides, and [she] believe[s] that was meant to be both shoulders, both arms. So she believe[s] that at the time [she] thought [they] were talking about both shoulders." *Id.* However, Dr. Brzezinski could not recall if she had treated Petitioner for left shoulder pain since the November 23, 2015 appointment. *Id.* When asked, Dr. Brzezinski again indicated her belief that the majority of treatment had been for Petitioner's right shoulder. *See id.* at 23. Additionally, when asked about the incident when Petitioner fell when walking her dog, Dr. Brzezinski did not recall discussing that incident again following that appointment. *Id.*

Petitioner's counsel asked Dr. Brzezinski to describe the information she had regarding the site of Petitioner's vaccination. *Id.* Dr. Brzezinski stated that Petitioner complained of shoulder pain, and Dr. Brzezinski "remember[ed Petitioner] always pointing to her right shoulder, after an injection." *Id.* at 23–24. Dr. Brzezinski continued that she did not "know how much [she] followed up." *Id.* at 24. She did not believe she "looked every time at [Petitioner's] shot record to double-check where she got her shot." *Id.* Dr. Brzezinski continued, "[b]ut then [Petitioner] told [Dr. Brzezinski] that . . . they gave [the shot] to [Petitioner] in her right shoulder but then documented it in her left shoulder and told her that they couldn't change the medical record." *Id.*

Respondent's counsel asked a series of questions about some of Dr. Brzezinski's appointments with Petitioner, both pre and post vaccination. *See id.* at 28–38. Respondent's counsel emphasized that for appointments on September 30, 2015, October 30, 2015, November 5, 2015, November 23, 2015, and January 21, 2016, the medical records included notes about issues Petitioner raised that were not the primary reasons for the appointments. *See id.* at 28–36. Respondent's counsel noted that "each [of those visits] was planned or scheduled in advance for follow-up on conditions that were raised on the previous visit[.]" *Id.* at 36. Respondent's counsel continued that "although each visit was scheduled to follow up or discuss a specific medical issue, at several of the visits other concerns were raised by" Petitioner and addressed by Dr. Brzezinski. *Id.* at 36. Respondent's counsel noted, and Dr. Brzezinski agreed, however, that the record from Petitioner's November 9, 2015 visit did not indicate that Petitioner complained of shoulder pain. *Id.* at 36–37. Respondent's counsel also noted that Petitioner's January 21, 2016 record identifying onset of her shoulder pain as eight weeks prior would place onset at November 26, 2015. *Id.* at 35. When asked how precise her patients generally are when they report symptom onset, Dr. Brzezinski indicated that it varies. *Id.* at 42. Respondent's counsel also asked about the May 24, 2016 note indicating that Petitioner was experiencing shoulder pain following a tetanus vaccine and the note from her January 2016 physical indicating that Petitioner declined a tetanus vaccine. *Id.* at 43. Dr. Brzezinski stated that she did not believe Petitioner received a tetanus vaccine. *Id.* at 4. Dr. Brzezinski stated that she thought this was a typographical error. *Id.* She continued that she thought "around that time [she] might have been under the understanding that maybe [Petitioner] was talking about the tetanus vaccine and not the flu shot." *Id.* Dr. Brzezinski continued that she "remember[s] being confused for a time period about that, which exactly [sic] shot [Petitioner] was talking about." *Id.*

## III.   Arguments of the Parties

Petitioner argues that the immunization summary identifying Petitioner's left deltoid as the site of her November 5, 2015 vaccination is "inconsistent with the overwhelming bulk of the record evidence." Pet'r's Br. at 9, ECF No. 61. She continues that:

> [a]s [P]etitioner's medical treatment records, coupled with her sworn affidavit, the affidavit of her daughter, the affidavits of all six other affiants, and the deposition of Dr. Brzezinski[] make clear, [P]etitioner's pain was in her right arm, her treatment for shoulder pain focused on her right arm, and the site of her vaccine administration was in fact her right arm.

*Id.* Petitioner notes that the records show that she "was treated for right shoulder pain again and again, over a period of more than three years[]" beginning in November 2015. *Id.* at 11. She notes that MRIs and physical examinations during this period showed right shoulder injury, pain, and loss of function but that there were "no equivalent left shoulder symptoms." *Id.* at 11–12. Petitioner argues that her sworn affidavit and her daughter's affidavit "constitute[] properly submitted probative evidence supporting [P]etitioner's position regarding the site of her vaccination." *Id.* at 12.

Regarding the onset of her shoulder pain, Petitioner argues that her "affidavit, as well as the affidavits of her daughter and her husband, [make it clear that P]etitioner began to experience unusual pain in her right arm well within [forty-eight] hours of her November 5, 2015[] vaccination." *Id.* at 13. She asserts that she complained of shoulder pain at her November 9, 2015 medical visit and that she "consistently linked onset of her right shoulder pain close in time with her November 5, 2015[] vaccination during many of her subsequent medical treatment visits." *Id.*

Respondent argues that "[t]he record as a whole does not provide preponderant evidence that [P]etitioner received her November 5, 2015 flu vaccine in her right arm as alleged." Resp't's Resp. at 6, ECF No. 63. In response to Petitioner's discussion of her daughter's affidavit, Respondent notes that Ms. Kabelitz's affidavit is not notarized or hand-signed and does not include indication that her statements were made under oath or penalty of perjury. *Id.* at 7. Respondent acknowledges that Petitioner's medical records demonstrate that she experienced right shoulder pain. *Id.* However, he maintains that the medical records "do not document the cause of that pain[]" and that "a causal connection has not yet been established . . . ." *Id.* Furthermore, Respondent asserts that "[P]etitioner's medical records include notations and observations pointing to non-vaccine causes of her right shoulder pain[,]" such as arthritis and a fall. *Id.*

Respondent further rejects Petitioner's argument regarding onset, claiming that "[P]etitioner's subjective reporting of right shoulder pain in temporal connection to her flu vaccination in later medical histories is insufficient to meet her burden[.] *Id.* at 8. He continues that "none of [P]etitioner's non-familial fact witnesses indicate that they saw [P]etitioner have or complain of shoulder pain within forty-eight hours of her vaccination." *Id.* Respondent further notes, citing Petitioner's January 21, 2016, April 27, 2016, and July 13, 2016 appointments, that "the medical histories do not place onset specifically within forty-eight hours of [Petitioner's] flu vaccination." *Id.* Noting the record from Petitioner's November 9, 2015 visit, Respondent argues that "[t]he objective portion of the contemporaneous medical records [] do not support [P]etitioner's claim that she began to experience right shoulder pain within" the requisite period. *Id.* at 8–9. He claims, referencing additional medical records, that Dr. Brzezinski's failure to record that Petitioner reported shoulder pain during that visit "would be a divergence from Dr. Brzezinski's tendencies to document complaints made by [P]etitioner regarding concerns other than the concern for which the appointment was scheduled . . . ." *Id.* at 9.

Respondent states that it is "curious" that Petitioner "did not schedule an acute appointment to seek treatment for new onset of right shoulder pain in the days or weeks following her vaccination[]" despite her claims regarding the severity of her pain. *Id.* Respondent asserts that, contrary to what Petitioner said in her affidavit, her November 23, 2015 appointment was not made to discuss shoulder pain but was instead "among a series of appointments scheduled in advanced

[sic] for follow-up of complaint(s) raised at the preceding visits." *Id.* He claims that "the November 23, 2015 appointment was scheduled to address [P]etitioner's heartburn and stomach aches, but at the appointment [P]etitioner raised <u>bilateral</u> shoulder pain that [P]etitioner related to a fall, causing Dr. Brzezinski to perform a musculoskeletal exam and order [X]-rays of [P]etitioner's left <u>and</u> right shoulder[s]." *Id.* at 9–10 (emphases in original).

In response to Respondent's arguments, Petitioner notes that sworn affidavits are not required for fact witnesses. Pet'r's Reply at 2, ECF No. 66. She argues that Ms. Kabelitz's declaration "is entitled to great weight as she was a direct eyewitness on the issue of which arm was vaccinated." *Id.* Petitioner notes that Respondent has not presented evidence in contradiction of Ms. Kabelitz's statements and has not requested that she be deposed or appear at a fact hearing. *Id.* at 2–3. Regarding Respondent's assertion that the medical records do not show the cause of Petitioner's right shoulder pain, Petitioner notes that such is not necessary for a Table SIRVA claim. *See id.* at 3. Petitioner further responds to Respondent's contentions regarding other possible causes of Petitioner's right shoulder pain. *Id.* Petitioner asserts that "the medical record [R]espondent cites regarding arthritis makes clear that arthritis was not responsible for [P]etitioner's right shoulder pain[]" because the record indicates that her pain began when she received her vaccination. *See id.* (citing Pet'r's Ex. 3 at 48). Petitioner also claims that the fall she suffered caused knee pain and that shoulder pain was not noted in that medical record. *Id.* at 3–4 (citing Pet'r's Ex. 11 at 19). Furthermore, in response to Respondent's criticism of Petitioner's reliance on affidavits, Petitioner asserts that "affidavit evidence is not unreliable subjective evidence." *Id.* at 4. Additionally, Petitioner argues that Dr. Brzezinski's deposition testimony supports Petitioner's contention regarding onset. *Id.* at 5.

### IV.    Applicable Legal Standard

To receive compensation under the Vaccine Act, Petitioner must demonstrate either that: (1) she suffered a "Table injury" by receiving a covered vaccine and subsequently developing a listed injury within the time frame prescribed by the Vaccine Injury Table set forth at 42 U.S.C. § 300aa-14, as amended by 42 C.F.R. § 100.3; or (2) that she suffered an "off-Table injury," one not listed on the Table as a result of her receipt of a covered vaccine. *See* 42 U.S.C. §§ 300aa-11(c)(1)(C); *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1319–20 (Fed. Cir. 2006).

The Vaccine Injury Table considers a SIRVA a presumptive injury for the flu vaccine if the first symptom or manifestation of onset of the illness occurs within forty-eight hours of an intramuscular vaccine administration. *See* 42 C.F.R. § 100.3(a)(XIV). The Qualifications and Aids to Interpretation ("QAI") further specify:

A vaccine recipient shall be considered to have suffered a SIRVA if such recipient manifests all of the following:

  i)  No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

ii)    Pain occurs within the specified time-frame;

iii)    Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

iv)    No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10). If, Petitioner is unable to succeed on a Table claim, Petitioner may, alternatively, prove that her injury was caused-in-fact by a Table vaccine. In order to succeed on a theory of causation-in-fact, Petitioner would have to show:

> by preponderant evidence that the vaccination brought about [the] injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury.

*See Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. § 11(c)(2). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." § 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993). Pursuant to Vaccine Act § 13(a)(1)(A), a petitioner must prove her claim by a preponderance of the evidence. A special master must consider the record as a whole but is not bound by any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. § 13(b)(1).

In Program cases, contemporaneous medical records and the opinions of treating physicians are favored. *Capizzano*, 440 F.3d at 1326 (citing *Althen*, 418 F.3d at 1280). This is because "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" *Id.* In addition, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Hum. Servs.*, 933 F.2d 1525, 1528 (Fed. Cir. 1993). Indeed, contemporaneous medical records are ordinarily to be given significant weight due to the fact that "the records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Id.* However, there is no "presumption that medical records are accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (finding

that a special master must consider the context of a medical encounter before concluding that it constitutes evidence regarding the absence of a condition.). While a special master must consider these opinions and records, they are not "binding on the special master or court." 42 U.S.C. § 300aa-13(b)(1). Rather, when "evaluating the weight to be afforded to any such . . . [evidence], the special master . . . shall consider the entire record . . . ." *Id.*

For cases alleging a condition found in the Vaccine Injury Table, special masters may find when a first symptom appeared, despite the lack of a notation in a contemporaneous medical record. 42 U.S.C. § 300aa-13(b)(2). By extension, special masters may engage in similar fact-finding for cases alleging an off-Table injury. In such cases, special masters are expected to consider whether medical records are accurate and complete.

In determining the accuracy and completeness of medical records, special masters will consider various explanations for inconsistencies between contemporaneously created medical records and later given testimony. The Court of Federal Claims has identified four such explanations for explaining inconsistencies: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014).

## V.    Discussion

### a.   Vaccination Site (Right or Left Shoulder)

Petitioner's vaccination record identifies her left deltoid as the site of her November 5, 2015 flu vaccination. Pet'r's Ex. 1 at 1. However, Petitioner asserts that this is "inconsistent with the overwhelming bulk of the record evidence[]" and that she received her vaccination in her right deltoid. Pet'r's Br. at 9. Respondent argues that the evidence in the record is insufficient to establish, by a preponderance of the evidence, that Petitioner received her vaccination in her right deltoid. Resp't's Resp. at 6. I find that Petitioner more likely than not received her vaccination in her right deltoid.

Although the vaccination record indicates that Petitioner received her vaccination in her left deltoid, Petitioner stated in her sworn affidavit that she received the vaccination in her right arm. Pet'r's Ex. 5 ¶ 1. Petitioner provided a detailed account, with contextual information, of the circumstances leading to the creation of her medical record. She recalled that she directed MA England to administer the vaccination in her right shoulder when she noticed that MA England was going to administer the vaccination in her left shoulder. *Id.* Petitioner noted that she explained to MA England that she wanted to receive the vaccine in her right shoulder because she is left-handed. *Id.* Petitioner stated that MA England had already documented in the computer that she was administering the vaccine in Petitioner's left deltoid. *Id.* Petitioner recalled that she asked MA England to correct this in the computer but that MA England declined. *Id.* Petitioner further recalled that MA England explained that she always inputs the left arm as the vaccination site because she assumes that almost everyone is right-handed. *Id.*

The Court of Federal Claims has identified a medical professional's failure to document everything a patient reported as an explanation for inconsistencies between contemporaneously created medical records and later given testimony. *La Londe*, 110 Fed. Cl. at 203. Petitioner is essentially alleging that MA England failed to document Petitioner's request to change the vaccination site. Petitioner's recollection of the circumstances surrounding MA England's creation of the medical record and her failure to correct it is sufficiently detailed to indicate reliability. Contextual details, like those Petitioner provided, are difficult to fabricate. Petitioner was able to recall the sequence of events and to explain why she requested the vaccine in her right shoulder. She also remembered MA England's explanation for why she tends to enter the left deltoid in the computer. Thus, I find Petitioner's explanation for why her vaccination record is incorrect persuasive.

Furthermore, some of Petitioner's witness declarations lend support to Petitioner's contention that she received her flu vaccination in her right shoulder. Ms. Kabelitz stated that she was present at Dr. Brzezinski's office when Petitioner received her vaccination. Pet'r's Ex. 13 at 3. It is unclear, however, whether Ms. Kabelitz witnessed Petitioner receiving her flu vaccination. Ms. Kabelitz and Mr. Kabelitz both indicated that Petitioner repeatedly identified her right shoulder as the site of her vaccination and reported that she told them she could feel where the shot was administered if she touched her arm. *Id.* at 3, 5. Mr. Perry, Ms. Grace, Ms. Boron, Ms. Donley, and Mr. Polazzo also indicated that Petitioner identified her right shoulder as the site of her vaccination. *See id.* at 7–12.

The medical records indicate that Petitioner repeatedly identified her right shoulder as the vaccination site. Petitioner reported right shoulder pain beginning in the fall of 2015 after a flu vaccination to PA Straus on April 27, 2016. Pet'r's Ex. 3 at 48.  On January 21, 2016, Petitioner presented to Dr. Brzezinski for shoulder pain that Petitioner attributed to her vaccination. Pet'r's Ex. 2 at 83. Although the record initially indicates that Petitioner was complaining about left shoulder pain, the remainder of the record only indicates that Petitioner was tested for and assessed with right shoulder pain. *See id.* at 83–86. Furthermore, Dr. Brzezinski testified that she believed the reference to left shoulder pain may be a typographical error. Pet'r's Ex. 17 at 21. This explanation is consistent with the remainder of this record.

On May 24, 2016, Dr. Brzezinski noted that Petitioner reported right shoulder pain after receiving a tetanus vaccination. Pet'r's Ex. 2 at 130. However, Petitioner's medical records indicate that she declined a tetanus vaccination on January 21, 2016, specifically due to right shoulder pain post flu vaccination. *Id.* at 83. Although Petitioner filed an additional record regarding her vaccination history upon Respondent's request for additional medical records, as well as pharmacy records, there is no indication that Petitioner received a tetanus vaccine. *See generally* Pet'r's Exs. 12, 14. Dr. Brzezinski stated in her deposition that she was confused as to which vaccine Petitioner was talking about. Pet'r's Ex. 17 at 42. Dr. Brzezinski noted that she believed her reference to the tetanus vaccine to be a typographical error. *Id.* Dr. Brzezinski's belief is credible given that Petitioner had declined a tetanus vaccine at Dr. Brzezinski's office a few months earlier. It is further credible given Dr. Brzezinski's note creation process, which involves filling in some details after appointments have ended. *See* Pet'r's Ex. 17 at 28. Dr. Shingles also wrote that Petitioner reported right shoulder pain for "around a year" following a tetanus

vaccination. Pet'r's Ex. 3 at 7. Again, however, there is no indication in the record that Petitioner received a tetanus vaccine in 2015 or 2016. Furthermore, it is unclear if Dr. Shingles had access to or used the record created by Dr. Brzezinski on May 24, 2016, when he created this medical record. I note and have considered these inconsistencies but must view them in light of the entire record.

Petitioner provided a detailed account of the administration of her November 5, 2015 flu vaccination. The evidence filed supports that, when Petitioner discussed this flu vaccination, she repeatedly and consistently identified her right shoulder as the vaccination site. I thus find, by a preponderance of the evidence, that Petitioner's November 5, 2015 flu vaccination was administered in her right shoulder.

### b. Shoulder Injury Onset

Petitioner alleges that her right shoulder pain began on the day of her November 5, 2015 vaccination. Pet'r's Ex. 5 ¶ 2. Petitioner's husband and daughter prepared declarations corroborating Petitioner's account. Pet'r's Ex. 13 at 3–6. Mr. Kabelitz stated that Petitioner reported her shoulder pain to him the night of her vaccination, and Ms. Kabelitz asserted that Petitioner complained of right shoulder pain the morning after her vaccination. *Id.* at 3, 5. Ms. Kabelitz also recalled Petitioner complaining of vaccine-related right shoulder pain to Dr. Brzezinski "a week or so" post vaccination. *Id.* at 3. Ms. Kabelitz further stated that Petitioner has consistently complained of shoulder pain "almost every day since getting the flu shot." *Id.* Despite Petitioner's affidavit and the declarations of her husband and daughter, the record as a whole does not support that Petitioner, by preponderant evidence, suffered from right shoulder pain within forty-eight hours of her vaccination. In fact, the record contains evidence that significantly undermines the reliability of Petitioner and her family's recollections regarding onset.

Petitioner and her family stated that Petitioner immediately complained of pain post vaccination, and that Petitioner conveyed her pain and belief that it was vaccine-caused to Dr. Brzezinski on November 9, 2015. Yet, eighteen days post vaccination, on November 23, 2015, Petitioner provided a very different account of her shoulder pain to Dr. Brzezinski. The medical record indicates that Petitioner did not mention her vaccination during this appointment. *See* Pet'r's Ex. 7 at 1–2. Instead, she discussed a fall she experienced a few years prior, complained of pain in both of her shoulders, and discussed fibromyalgia and arthritis. *Id.* She also questioned whether her bilateral shoulder pain was related to neck pain and stiffness. *Id.* A physical exam revealed bilateral shoulder pain. *Id.* at 2. Petitioner also underwent X-rays of both of her shoulders, and neither X-ray showed significant abnormalities. Pet'r's Ex. 2 at 212–13. Furthermore, although Petitioner stated in her affidavit that she made her November 23, 2015 appointment to discuss her right shoulder pain, Pet'r's Ex. 5 ¶ 3, the medical record states that heartburn was the primary reason for her visit. Pet'r's Ex. 7 at 1. The record from November 5, 2015 indicates that Petitioner had been directed to return for an asthma follow-up in two weeks. Pet'r's Ex. 2 at 65. This suggests that Petitioner's November 23, 2015 appointment may have already been scheduled. Unlike with her vaccination record or her November 9, 2015 appointment record, Petitioner has not alleged that her November 23, 2015 medical record is incorrect or incomplete.

I find that Petitioner and her family's account regarding onset and her November 23, 2015 medical record are wholly inconsistent. Petitioner and her family assert that Petitioner complained both about her pain and identified a cause within forty-eight hours. The November 23, 2015 medical record indicates that Petitioner identified a fall, fibromyalgia, and arthritis as potential causes. Further, the remainder of her medical record does not demonstrate that Petitioner experienced right shoulder pain immediately, or within forty-eight hours of her vaccination. I give greater weight to the November 23, 2015 medical record, in part, because it is a contemporaneously created medical record. There is no "presumption that medical records are accurate and complete . . . ." *Kirby*, 997 F.3d at 1383. However, contemporaneous medical records are entitled to significant weight because they are "generally contemporaneous to the medical events[]" and created with "proper treatment hanging in the balance[.]" *Cucuras*, 933 F.2d 1525. Petitioner's November 23, 2015 medical record was created the same month as both her vaccination and alleged SIRVA onset. Petitioner's affidavit, however, is dated April 19, 2017, nearly one-and-a-half years after the events at issue. *See* Pet'r's Ex. 5. Petitioner's supplemental affidavit and her husband's declaration are both dated in January 2019, more than three years post vaccination. Pet'r's Ex. 13 at 2, 6. Ms. Kabelitz's declaration is not dated but was filed with Petitioner's supplemental affidavit and witness declarations on February 4, 2019. *See id.* at 4. Because Petitioner's November 23, 2015 medical record was created close-in-time to the events at issue, it is more likely to be accurate than witness statements given approximately one to three years after said events. Unlike with her vaccination record, Petitioner has not offered an explanation for the inconsistencies between her and her witness's accounts and the November 23, 2015 medical record. Furthermore, the fact that Petitioner received X-rays on both shoulders supports that the account of bilateral shoulder pain she provided on November 23, 2015 was accurately recorded.

This discussion is specifically about the onset of Petitioner's right shoulder pain and whether it occurred within the period mandated by the Table and QAI. It is true that alternative causes of Petitioner's right shoulder pain, pain in other areas of her body, and pre-existing shoulder pain are separate issues in the QAI that are not directly related to the question of onset. However, the Federal Circuit has stated that special masters, as finders of fact, "are entitled—indeed, expected—to make determinations as to the reliability of the evidence presented to them and, if appropriate, as to the credibility of the persons presenting that evidence." *Moberly*, 592 F.3d at 1326. In this case, the report Petitioner provided to Dr. Brzezinski regarding alternative causes and other issues is highly relevant to a determination of the reliability of her and her witness' non-contemporaneous accounts, because it shows significant inconsistencies regarding what Petitioner reported in November 2015. For instance, Petitioner claims that she suspected, and reported to Dr. Brzezinski on November 9, 2015, that the right shoulder pain she was experiencing in November 2015, was caused by her flu vaccination. Yet, on November 23, 2015, Petitioner referenced multiple potential causes of her shoulder pain but did not mention her flu vaccination.

Additionally, Dr. Brzezinski was unable to independently verify that Petitioner reported right shoulder pain on November 9, 2015. Pet'r's Ex. 17 at 8, 13–14. Respondent has pointed out, and the medical records reflect, that Dr. Brzezinski generally noted complaints brought up during appointments, even if they were not the main focus of the visit.  Petitioner also visited orthopedists in December 2015 and on January 11, 2016, for other problems she was experiencing. *See* Pet'r's Ex. 11 at 16–18, 19–21, 22–23, 49, 53–54. It is curious that Petitioner visited these orthopedic specialists and only reported shoulder pain on an intake form rather than during treatment. *See id.*

at 49. That Petitioner reported right and left shoulder pain on this form indicates that the account she provided to Dr. Brzezinski on November 23, 2015, is accurate. Furthermore, none of Petitioner's medical records corroborate that Petitioner experienced right shoulder pain within forty-eight hours after her vaccination. On January 21, 2016, Petitioner reported that she had been experiencing shoulder pain for eight weeks. Pet'r's Ex. 2 at 23. This would place onset on November 26, 2015, which is, notably, within a few days of her November 23, 2015 appointment. On April 27, 2016, Petitioner told PA Straus that she "g[ot] a flu shot last fall, and . . . this is when her pain started[,]" Pet'r's Ex. 3 at 48, but it is unclear from this record precisely when her pain began.

None of these issues, when viewed independently, are necessarily fatal to Petitioner's account regarding onset. Indeed, special masters must consider the record as a whole. Petitioner's affidavit and witness declarations provide some evidence that the onset of her right shoulder pain occurred within forty-eight hours of her vaccination. But I must weigh this evidence against the other evidence in the record, including her November 23, 2015 medical record. In addition to the contemporaneity of this medical record, there are facts contained within the record that undermine Petitioner and her witnesses' accounts. Furthermore, the record does not contain other evidence specifically corroborating that onset occurred within forty-eight hours post vaccination. After thorough consideration of the entire record, I find that Petitioner has not provided preponderant evidence that Petitioner experienced right shoulder pain within forty-eight hours after her November 5, 2015 flu vaccination. I find that there is preponderant evidence that Petitioner experienced right shoulder pain beginning on or around November 23, 2015.

## VI.    Conclusion

Based on the above reasoning, I find that Petitioner has provided evidence establishing it more likely than not that she received her flu vaccination in her right shoulder. I find that Petitioner has not provided evidence establishing it more likely than not that she experienced right shoulder pain within forty-eight hours after her vaccination. Petitioner has fourteen (14) days from the filing of this ruling to file a status report indicating how she wishes to proceed.

**IT IS SO ORDERED.**

s/Herbrina D. Sanders
Herbrina D. Sanders
Special Master